391 A.2d 624

**Alan FRANK and Raymond Radakovich**

**v.**

**Gerald L. PECKICH and Mercedes Peckich, his wife, Appellants.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1976.

Decided July 12, 1978.

Reargument Denied Aug. 23, 1978.

564

568

Robert E. Wayman, Pittsburgh, for appellants.

John J. McLean, Jr., Pittsburgh, for appellees.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT and SPAETH, JJ.

## OPINION

PER CURIAM:

The six Judges who decided this case being equally divided, the judgment is affirmed.

SPAETH, J., files an opinion in support of affirmance in which HOFFMAN and CERCONE, JJ., join.

PRICE, J., files an opinion in support of reversal in which JACOBS, P. J., and VAN der VOORT, J., join.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

SPAETH, Judge, in support of affirmance:

Appellees Frank and Radakovich, attorneys, sued appellants Gerald and Mercedes Peckich to recover a contingent fee allegedly owed them for their representation of appellants in a complex land acquisition transaction. A jury found for appellees in the amount of $200,000. The lower court denied motions for new trial and judgment notwithstanding the verdict and entered judgment on the verdict. This appeal followed.

In late February and early March 1974, Gerald Peckich and a business acquaintance, Arthur Silverman, became interested in buying a vacant industrial plant in Beaver County owned by the A. M. Byers Company. The plant consisted of approximately 120 acres of land, about forty buildings, and large quantities of copper and steel scrap. On March 25, after consultations with financial and legal advisors, including Frank and Radakovich, Peckich and Silverman borrowed $150,000 on a thirty-day note. Using this as "hand money," Peckich and Silverman signed an agreement of sale with Byers. Under the agreement, the purchase price for the property was $1,775,000, the balance of $1,625,000 after payment of the hand money to be paid within thirty days. According to appellants, during the last several days of the negotiations that resulted in the agreement of sale, and for the next month, Peckich was represented by Frank and Radakovich; Silverman was represented by other attorneys.

After signing the agreement of sale, Peckich and Silverman considered how the balance of the purchase price might be financed. The exact details of the convoluted negotiations that ensued are not relevant to this appeal. It is sufficient to note that appellees offered testimony—some of it corroborated by Peckich—that they were active in representing Peckich during these negotiations. After several avenues that had looked promising proved to be dead ends, Frank gained the interest of a New York scrap dealer, Leonard Weisman, with whom he was acquainted. At first Weisman was interested only in contracting for rights to the scrap on the Byers property. However, on April 6, at

Frank's suggestion, Frank and Peckich called Weisman and proposed that Weisman take over the financing of the acquisition. Weisman agreed, and on April 8 flew to Pittsburgh to negotiate unsettled details. On April 12, Peckich, Silverman, and Weisman executed agreements providing as follows: Peckich and Silverman assigned to Weisman their agreement of sale with Byers; Weisman agreed to provide $2,000,000, in part to provide the entire purchase price of $1,775,000, [1] in part to pay $225,000 in addition for unspecified extras; Weisman, after taking title to the Byers property, would deed over approximately ninety acres to Peckich and Silverman; [2] and Weisman would continue to have rights to some or all of the scrap on the property.

On April 25, at the closing scheduled in accordance with the March 26 agreement of sale, Byers conveyed the property in question to the J. J. Gumberg Co., local nominee of Weisman; Weisman provided the full purchase price of $1,775,000; and Peckich and Silverman received back their hand money. Whether Peckich and Silverman also received their ninety acres from Weisman (through Gumberg) on April 25, and in what form (*i. e.,* in a recordable deed or not), is a matter of some dispute, which cannot be resolved from the record. We find, however, that for the purposes of this appeal the dispute does not need to be resolved. It is not disputed that Peckich and Silverman did not receive the extra $225,000 provided for in their assignment to Weisman.[2a]

1. By these agreements, at closing Peckich and Silverman were to receive back their $150,000 hand money.

2. The disposition of the remaining approximately thirty acres is not relevant to this appeal. Apparently—although this is by no means clear from the record—Weisman conveyed the remainder to the Beaver County Industrial Development Authority in return for $2,000,000 in municipal bonds, which are to be retired from rent by a new tenant, Levinson Steel Company.

2a. While we do not resolve the dispute as to when, in what form, and in what quantity appellants got their share of the Byers property, it is important to note that they *did* get major benefits from the entire transaction. Appellees offered in evidence a deed dated April 26, 1974, signed by Gumberg, conveying (according to Frank) approxi-

On April 11, during the above negotiations, Frank and Radakovich had discussed the question of their fee with Peckich and Silverman. Frank stated that in view of the apparent success of his efforts to assure financing for the venture, he thought a fee of $200,000 was warranted, "payable at the closing." (R. 118a.) According to Frank, Peckich agreed immediately to this contingent fee, and Silverman agreed after some initial reluctance. Therefore, after the closing on April 25, Frank and Radakovich met with Peckich and Silverman to ask when they could expect payment. When Peckich and Silverman stated that they would not pay the fee, Frank and Radakovich terminated their representation and on April 29 filed suit against Peckich and his wife and Silverman and his wife. Since a voluntary discontinuance was entered as to the Silvermans, and a count in quantum meruit was abandoned during trial, the suit came down to one on a contingent fee agreement between appellees, Frank and Radakovich, as attorneys, and appellants, the Peckichs, as clients.

-a-

Appellants argue that the lower court should have granted their motion for judgment n. o. v., because appellees failed to prove the occurrence of the contingency on which the fee agreement turned.

■■■ It is settled that

[i]n considering a motion for judgment n. o. v., the evidence, together with all reasonable inferences capable of being drawn therefrom, must be viewed in the light most favorable to the verdict winner. *Flickinger Estate v. Ritsky*, 452 Pa. 69, 305 A.2d 40 (1973). The court must find and consider only that evidence which supports the verdict, and all conflicts must be resolved in favor of the

mately sixty acres to appellants. This fact is especially important in light of Peckich's denial that he had received a deed; on cross-examination he admitted knowledge of the deed in evidence.

Moreover, Frank testified that at closing Weisman paid appellants $50,000 as their share in the scrap-contract aspect of the tangled transactions that accompanied the land acquisition.

prevailing party. *Moyer v. Ford Motor Co.*, 205 Pa.Super. 384, 209 A.2d 43, *allocatur refused,* 205 Pa.Super. *xxxvii* (1965). *Winkler v. Seven Springs Farm, Inc.*, 240 Pa.Super. 641, 643–4, 359 A.2d 440, 441 (1976).

It has also been said that "[j]udgment n. o. v. should be entered only when the facts are such that no two reasonable persons could fail to agree that the verdict was improper." *Cummings v. Nazareth Borough,* 427 Pa. 14, 25–26, 233 A.2d 874, 881 (1967).

■ Here, appellants insist that appellees' own case affirmatively demonstrated that the fee had not yet been earned at the time of the closing on April 25. To buttress this argument, appellants cite testimony by both appellees to the effect that at the closing appellants "received legal title to only 80 per cent of the land to which they were entitled, and that Weisman paid only $1,800,000, or approximately $200,000 less than was due." Appellants' Brief at 7. The difficulty with this argument is that it assumes that appellees agree with appellants that the contingency agreed upon was the perfection of all steps of the transaction: passage of title from Byers to Weisman, payment of $225,000 by Weisman to appellants, and passage of title to ninety acres from Weisman to appellants. This is not appellees' version of the agreement.

Radakovich testified that at the April 11 meeting between the parties to discuss the fee, "a contract was entered into, that they would pay $2,000 [*sic*—later corrected to "$200,-000"]—Mr. Peckich would pay $2,000 on the successful passage of title of a deed from A. M. Byers to Weisman or his nominee, Gumberg, because he really wanted title out of Byers because he was worried about the project getting away." R. 424a. This testimony is admittedly Radakovich's conclusion of what the agreement was, but it is corroborated by other testimony that suggests that Peckich hired appellees to use their abilities to ensure that the April 25 closing take place. For example, Radakovich testified that immediately after the closing Peckich said: "Well it's over; we

signed. The deed's out of Byers. That's all I care about." R. 385a.

Frank testified on cross-examination that on April 4, after the parties learned that they would be unable to get one of the suggested means [3] of financing the balance of the purchase price, he assured Peckich: "If the project isn't completed, you don't owe us anything . . . . He said we want to pay you anyway. I said no. It will be a larger fee if it goes through to closing. No fee if we don't have it closed." R. 328a. Then the following appears:

Q. When you say the project completed, do you mean completed to the satisfaction of Mr. Peckich? Or what did you mean by completed? If the project is not completed, you do not owe me a fee. Now, what did you mean when you said to Mr. Peckich if the project is not completed you do not owe me a fee?

A. You have to understand the problem at the time was April 25, the deadline.

Q. Mr. Frank, the question is—

A. I'm answering your question, Mr. Wayman [counsel for appellants].

Q. I don't believe you are, Mr. Frank.

A. And we all understood there was no mistake about the problem as of April 4. We had three weeks to go, and it looked like no money. And if we didn't come up with 1,625,000 by April 25, that agreement [4] could have become null and void.

. . . . .

What was meant by that expression at the closing, conclusion, was does that agreement get effectuated and carried out, or do we lose it? And the assignment [5] was

3. A letter of credit from Mellon Bank.

4. The March 26 agreement of sale.

5. The Peckich & Silverman/Weisman assignment of the March 26 agreement of sale.

to keep us from losing it. That's what we all understood it to be. R. 329a–330a.

The only testimony by appellees that supports appellants' argument is the following, by Frank on cross-examination:

A. [On April 11, t]hat's when I told Mr. Peckich our fee, $200,000 payable at the closing.

Q. Yeah, well, now, what was contingent about that?

A. No closing, no fee.

Q. No closing, no fee. Was it no closing, no fee; or no fee if this matter is not satisfactorily concluded? Which words did you use?

A. Payable at the closing. I believe in later discussions I may have used the words satisfactory conclusion. There was no disagreement. We all understood what it was to get the deed out of Byers into Weisman, back to us and Levinson. We knew on April 11th what that meant. R. 258a.

This seems to contradict Radakovich's testimony quoted above, that the contingency was only the signing of the deed between Byers and Gumberg. Frank's testimony here seems to contemplate two events: the conveyance by Byers to Gumberg and the conveyance by Gumberg to appellants. We do not think, however, that this inconsistency is fatal to appellees' case. First, Frank's language is somewhat free-form, and we think the jury could justifiably choose to rely instead on Radakovich's clearer statement of the contingency. Second, Radakovich may have done enough to explain the inconsistency, when he testified:

A deed was going to pass from Byers to Weisman's nominee of the entire acreage. And then, Peckich and Silverman at some other time, either then [at closing on April 25] or later, were to receive a deed of everything other than the thirty acres [6] to them. R. 379a.

Thus the agreement between the parties may have been: that appellees were to work to ensure that the April 25

---

6. The approximately thirty acres that went to the Beaver County Industrial Development Authority.

closing between Byers and Gumberg took place successfully; that it was understood that this event would make possible—perhaps with some further steps required [7]—the eventual passage of title to Peckich and Silverman; and that the first service—effectuating the Byers/Gumberg closing—merited the contingent fee because it made possible the next steps. Under this interpretation, Frank's words may have been consistent with Radakovich's. He may have meant: "We all understood what a difficult task it was to get the deed out of Byers into Weisman, back to us and Levinson. We all knew on April 11th what that meant—that our service to guarantee the first step was the key to the success of the entire transaction, and therefore was worth our fee." True it is that Frank could have meant instead: "We all understood what the 'satisfactory conclusion' was: to get the deed out of Byers into Weisman, back to us and Levinson." However, for the purposes of deciding whether a motion for judgment n. o. v. should have been granted, we must read the record in the light most favorable to appellees. Following that rule, we find that appellees sufficiently proved the occurrence of the contingency they alleged.

Given the rather shaky case presented by appellees, one might suppose that appellants should have had little trouble in overcoming it. The interesting point is, however, that appellants in fact offered no evidence to prove the version of the contingency that they now argue. Instead, Peckich insisted that he had never agreed to pay the fee. The jury did not believe him, and he has not pressed this argument on appeal. Thus it appears that appellants made a decision of trial strategy, to counter only the evidence that a contract had been made; that they elected to rely on appellees to hang themselves by proving a contingency that did not occur; and that appellants now hope that we will assess appellees' testimony differently than did the jury. As we

7. As proved to be the case, it later being found necessary to delay signing of the deed from Gumberg and Silverman to await precise surveys.

have demonstrated, we are not persuaded. The motion for judgment n. o. v. was properly denied.[7a]

-b-

Appellant Mercedes Peckich offers a separate argument why judgment n. o. v. should have been granted her: appellees did not sufficiently prove that her husband was empowered to contract with appellees on her behalf. This claim has been waived.

By statute,[8] and by the case law interpreting the statute,[9] judgment n. o. v. may be sought only by one who has first submitted a point requesting binding instructions. Here, appellants submitted the following point: "Under the law and the evidence, the verdict must be for the defendants, Gerald L. Peckich and Mercedes Peckich." R. 54a. We do not think this sufficiently raises the point that Mrs. Peckich now argues.

**7a.** Judge PRICE, dissenting, concludes that appellees' own testimony demonstrates that there had not been "successful and desirable consummation of the various transactions" alleged in the complaint. To reach this conclusion it is necessary to read into appellees' testimony something that is not necessarily there.

Judge Price notes that Frank admitted on cross-examination that appellees did not receive at closing all that they had bargained for with Weisman. The question, however, is: What was the contingency agreed upon by appellants and appellees? Was it the receipt of *all* that appellants had bargained for with Weisman, or was it instead the receipt of something else, which was *less* than appellants had bargained for with Weisman? Appellees insisted that the agreement was for something less, as we have outlined above. Apparently the jury believed appellees; Judge PRICE believes appellants.

We cannot see that we have shifted the burden of proof to appellants, as Judge PRICE seems to suggest. Rather we have found that, appellees having met their burden of going forward with proof of the terms of the contingent fee agreement and of the occurrence of the contingency, the burden shifted to appellants to disprove appellees' case. As demonstrated by our discussion, and (what is more important) by the jury's verdict, appellants did not disprove appellees' case.

**8.** Act of April 22, 1905, P.L. 286, § 1; April 9, 1925, P.L. 221, § 1; 12 P.S. § 681.

**9.** *See Dora v. Dora*, 392 Pa. 433, 141 A.2d 587 (1958); *Essex Packers, Ltd. v. Kisecker*, 373 Pa. 351, 95 A.2d 544 (1953).

In general, our lower and appellate courts have not been overly strict on the form that a request for binding instructions must take. *See Bloom v. Pike Township School District,* 162 Pa.Super. 148, 56 A.2d 348 (1948); *Eckenrode v. Produce Trucking Co.,* 49 Dauph. 271 (1941). The one condition that must be met is that the request be written, *Smith v. Graham,* 101 Pa.Super. 604 (1931); an oral request may not be cured by an order correcting the record *nunc pro tunc. Thomas F. Leonard Co. v. Scranton Coca-Cola Bottling Co.,* 90 Pa.Super. 360 (1927). However, we believe that where, as here, the defendants argue two theories in support of their motion for judgment n. o. v.—one applicable to both defendants, the second only to one defendant—the request must clearly set forth both theories, so that the lower court will know what it is being asked to decide. Here, appellants' request in effect asked the court to decide only whether appellees had proved all elements of their case against "Gerald L. Peckich and Mercedes Peckich." Since husband and wife were thus described as an entity, the request did not raise the question whether appellees had proved a particular aspect of their case against Mercedes Peckich alone.

An analogous case is *King v. Philadelphia Suburban Transportation Co.,* 160 Pa.Super. 26, 50 A.2d 34 (1946). There we held that a defendant's point for binding instructions in its favor were insufficient to preserve the claim that judgment n. o. v. should have been granted against an additional defendant. Though the factual setting is different, the principle of *King* applies here: that the request for binding instructions must notify the court of the point (or points) it is being asked to decide.

■ Our reasoning might be thought harsh in light of appellants' motion for a directed verdict at the close of appellees' evidence; in that motion appellants specifically argued both theories—failure to prove a contract and the contingency, and failure to prove authority in Gerald Peckich to bind Mercedes Peckich. However, it must be noted that after the motion for directed verdict was denied, Mercedes Peckich took the stand and on cross-examination did

considerable damage to her claim that she did not authorize her husband to act for her in the negotiations in question. For example:

Q. Mrs. Peckich, your husband has been in the real estate and involved in the business for some years, has he not?

A. Yes.

Q. And he has taken ownership of various property in both your names, has he?

A. Yes.

Q. And it was customary for him to handle the problems involving these deals, was it not?

A. Yes.

Q. You did not take part in the business transactions, did you?

A. No.

Q. He acted on your behalf, did he not?

A. Sometimes.

Q. In handling these deals involving the real estate, did he not act on your behalf?

A. Yes.

Q. Were you ever aware that your husband went to Alan Frank's office?

A. Yes.

Q. And he went to his office during March and April?

A. Yes.

Q. And you were content to let your husband handle any of these business problems, weren't you?

A. I had too many other things on my mind.

Q. Yes; and you were content to let your husband handle the business problems; is that right?

A. Yes. R. 608a–610a.

In light of this testimony, we believe we are justified in finding that by the time they presented their request for

binding instructions, appellants had abandoned their claim that as a matter of law appellees had not proved agency.[10]

-3-

In their motion for new trial, appellants argue that the lower court made numerous errors in its charge to the jury. We find no reversible error.

-a-

Appellants contend that the charge unfairly and prejudicially favored appellees' evidence and neglected appellants'. We have reviewed the charge in its entirety, as we must, *Mount v. Bulifant,* 438 Pa. 265, 265 A.2d 627 (1970), and find that it was fair to both sides; contrary to appellants' view, it did not "review the evidence of one side and ignore vital countervailing evidence." *Sears v. Birbeck,* 321 Pa. 375, 384, 184 A. 6, 10 (1936). It is true that the charge discussed appellees' evidence in greater detail than it did appellants', but by our reading of the record this balance was in proportion to the substance of the evidence presented by each side.

-b-

Appellants contend that the court did not adequately charge on the applicable law, in four respects:

1. The court did not charge that to make a contract there must be an assent of two minds *to the same thing.* (The court said: "[A contract] involves the meeting of the minds of the contracting parties." R. 835a.) However, since

10. For the standard for proof of agency between husband and wife, see Restatement (Second) of Agency § 22(b) (1958):

Neither husband nor wife by virtue of the relation has power to act as agent for the other. The relation is of such a nature, however, that circumstances which in the case of strangers would not indicate the creation of authority or apparent authority may indicate it in the case of husband and wife. Thus, a husband habitually permitted by his wife to attend to some of her business matters may be found to have authority to transact all her business affairs.

"The law of Pennsylvania is in accord with the Restatement." *Tonuci v. Beegal,* 188 Pa.Super. 66, 70, 145 A.2d 885, 888 (1958).

appellants introduced no evidence to suggest that Peckich agreed to something different than appellees proposed, appellants were not entitled to an instruction covering this particular facet of contract law. "A trial court should not instruct the jury on law applicable to no facts in the case." *Auerbach v. Philadelphia Transportation Co.,* 421 Pa. 594, 602, 221 A.2d 163, 170 (1966).

2. The court did not charge that to make a contract there must be an offer on one side and an unconditional acceptance on the other. We think the court did not err in choosing, instead, more everyday language: "agreement," "assent to or consent to a situation," "an understanding," "an arrangement," "a meeting of the minds." As Justice MUSMANNO said, "A judge's charge should appeal to a jury's intelligence, not to his dictionary at home. A trial judge should aim at enlightening the persons who are to be guided by it." *Kurtz v. Philadelphia Transportation Co.,* 394 Pa. 324, 331–32, 147 A.2d 347, 351 (1959).

3. The charge did not state that if the jury found that the fee sued upon was conditioned upon completion of various transactions, completion of the various transactions constituted a condition precedent. Again, we do not fault the court for using less formal means of expression: "Contingent fee means, of course, if you don't prevail, if your clients don't prevail, if they don't succeed in the goal that you're seeking, then, the lawyers would receive nothing." R. 837a. The necessity of the occurrence of the contingency is contained in this instruction, by implication: "If their clients do succeed, the lawyers get their fee."

4. The charge on agency was misleading and insufficient. We find it unnecessary to discuss this point in detail; the charge on agency was discursive and informal, but sufficient.

-c-

In reviewing the evidence, the lower court stated:

Now, of course, at the closing here, for some reason or other, Weiscorp [Weisman's business entity] was $200,000 short in what they were supposed to produce. It's understandable that Mr. Peckich and Mr. Silverman would elect to go through anyhow, because that was not vital as far as their acquiring the property is concerned. But it could have some relationship, although the amounts are just perhaps coincidental, that the 200,000 was short and the $200,000 fee was claimed. And in that regard, it must be understood that Mr. Weisman or Weiscorp have contracted to pay $200,000 more. And so far as I can see, there is no reason that they cannot be compelled to pay it. R. 851a.

Appellants object to this passage on two grounds. First, appellants argue that it implies fraudulent or conspiratorial conduct on their part. We do not see that the passage contains this implication. Second, appellants argue that the statement that there appears no reason why Weisman cannot be compelled to pay the $200,000 is similar to the mention of liability insurance in a personal injury action, and therefore similarly constitutes reversible error. We see the similarity, but do not think it is close enough.

Evidence of liability insurance is inadmissible in a negligence action because it is both irrelevant and potentially prejudicial. *Price v. Yellow Cab Co.*, 443 Pa. 56, 278 A.2d 161 (1971) (Opinion in Support of Affirmance). Here, by contrast, the court's mention of the additional money [11] that Weisman owed appellants, while potentially prejudicial, was not irrelevant; it was, rather, an integral part of the narrative of the events surrounding the closing. Without this mention of the possibility that appellants would be able to get paid, the jury might have assigned more weight to the fact that appellants had not yet been paid than was warranted by the facts. In this regard, it must be recalled that

11. We are hesitant to use an exact figure. The record is unclear whether Weisman owed appellants $225,000, $200,000, or perhaps even less. On this last possibility, we have reference to Frank's testimony that appellants received $50,000 from Weisman at the April 25 closing. *See* note 2a *supra*.

584

appellants did not offer proof that payment of the additional money was part of the contingency agreed upon with appellees. Under these circumstances, the court's mention of the point was not error.

-d-

The court charged that in assessing credibility the jury should take into account the witnesses' interest in the outcome of the case, and further stated that in this case "we don't have any strictly disinterested witness testifying." R. 833a. We agree with appellants that this latter statement was inaccurate, but we do not see how appellants were harmed by it. They mention only one defense witness who was disinterested; we have reviewed his testimony and consider that it contributed virtually nothing to appellants' side of the case. Therefore the possibility that the jury discounted his testimony is not material to the outcome.

-e-

Appellants argue that the lower court erred in its treatment of three items of testimony:

1. Frank testified that he was responsible for Weisman's agreement that appellants would get back their hand money at closing. The court stated that he did not recall that appellants contradicted this assertion. The court was correct. Appellants' testimony was that they had negotiated the agreement with *Byers* that they would get back the hand money if closing did not take place. The agreement with Weisman came later; appellants did not testify that they had anything to do with obtaining the provision in this latter agreement promising them their hand money.

2. The court stated that it did not recall defense testimony in opposition to Frank's assertion that he was the moving force behind the agreement with Weisman. Appellants' complaint that this statement was inaccurate has been waived, because they took no specific exception on the point. *Dollison v. Baltimore & Ohio Railroad Co.,* 446 Pa. 96, 284 A.2d 704 (1971).

■ 3. The court stated that Peckich did not testify to what he had thought an equitable fee would be. The court was correct. It was for the jury to decide whether Peckich's testimony that Frank had charged him $50 an hour in the past for more routine legal services contained an implication that Peckich thought that Frank was, or should have been, charging the same rate for the services in this case.

-f-

Appellants suggest that the court's charge cast an improper burden of proof on the defense. We find nothing in the charge to substantiate this claim.

-g-

Appellants contend that the lower court erroneously charged on issues not pleaded:

■ 1. Quantum meruit was pleaded, but abandoned. Appellants argue that the court nevertheless charged on quantum meruit. Since they took no specific exception on this point, appellants have waived the claim. *Dollison v. Baltimore & Ohio Railroad Co., supra.*

■ 2. The court charged that the jury could find for appellees in the amount of $200,000 or $100,000. Appellants suggest that the latter choice was in effect a charge on quantum meruit. We disagree. There was some testimony that Peckich had agreed to pay Silverman's half of the fee if Silverman declined to do so. As the lower court observed, "it certainly was within the province of the jury to decide that Peckich had agreed to the fee as proposed, but had not definitely undertaken to pay the half which had been intended to be the obligation of the Silvermans." Lower Court Opinion at R. 897a.

■ 3. Appellants argue that the lower court charged that appellees could be found to have earned a finder's fee. We do not read the charge this way. In reviewing the evidence of the various services that appellees provided, the court stated that appellees were "in one sense finder of

finances." R. 839a. This brief reference in the narrative of the evidence did not obscure the court's clear charge that the suit was for a contingent fee.

-h-

Appellants argue that the lower court erred in refusing to charge on an attorney's obligations under Pa.R.Civ.P. 202, which provides that contingent fee agreements "shall be in writing." There are two answers to this argument.

First, a Rule of Civil Procedure governs only cases brought before the civil courts; it has no applicability to business conducted by attorneys and their clients in the world outside the courts. *See Berlant Appeal,* 458 Pa. 439, 328 A.2d 471 (1974) (Concurring and Dissenting Opinion by MANDERINO, J.) (by implication), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975). Here, the contingent fee agreement between appellants and appellees was not related to a court case, but only to private contract negotiations.[11a]

11a. Judge PRICE, dissenting, vigorously states the case for a requirement that all contingent fee agreements between attorneys and clients be in writing. We entirely agree with the policy considerations he cites in this regard. However, these policy considerations are present in all cases and situations in which contingent fee arrangements may be found: civil cases before the courts, civil cases before other adjudicatory bodies (e. g., boards of arbitration and administrative agencies), and even criminal cases. To require written contingent fee agreements in all such cases and situations would, we agree, be desirable; but we believe that to have so broad a scope, the requirement would have to be either by statute, or by a comprehensive rule promulgated by the Supreme Court (as for example, by an addition to Disciplinary Rule DR 2–106). We cannot agree with Judge PRICE's conclusion that the cases show Rule 202 of the Rules of Civil Procedure to be such a comprehensive rule.

The paragraph cited by Judge PRICE from Mr. Justice MANDERINO's Concurring and Dissenting Opinion in Berlant Appeal, *supra,* supports our reading of the scope of Rule 202 rather than Judge PRICE's. · We refer particularly to the sentence: "The cases considering the validity of contingent fee agreements make no distinction as to the subject matter of the *litigation taken pursuant to the agreement.*" 458 Pa. at 454, 328 A.2d at 480 (emphasis added).

Judge PRICE states that "*Silverstein* [*v. Hornick,* 376 Pa. 536, 103 A.2d 734 (1954)], a leading case on Rule 202's construction, is similar to the instant case in that the agreement there was likewise not made

 Second, even if Rule 202 applies to all contingent fee agreements between attorneys and clients, and is to be regarded as in the nature of a statute of frauds, still the Rule would have no applicability to this case because appellants waived it as a defense.

The affirmative defense of a waivable statute of frauds must be raised in New Matter, Pa.R.Civ.P. 1030; otherwise it is waived, Pa.R.Civ.P. 1032. "The statutes of frauds required to be pleaded by Pa.R.C.P. 1030 are those such as the one considered in *Sferra v. Urling et al.* [328 Pa. 161, 195 A. 422 (1937)], where noncompliance does not deprive the agreement of legal effect nor limit the power of the judiciary to afford a remedy." *Leonard v. Martling,* 174 Pa.Super. 206, 215, 100 A.2d 484, 488 (1953), *aff'd,* 378 Pa. 339, 106 A.2d 585 (1954). Construed as a statute of frauds, Rule 202 is waivable, for as demonstrated by *Silverstein v. Hornick, supra* note 11a, non-compliance with the Rule does not deprive an agreement of legal effect. Here, appellants did not plead Rule 202 in their New Matter.

-4-

 Appellants wished to call Weisman to testify, and asked the court to issue a protective order immunizing him from service of process so that he would feel safe in coming from New York to Pittsburgh. (Numerous suits involving

in anticipation of litigation." Dissenting Opinion at 639. The facts of *Silverstein* are not entirely clear on this point, at least so far as the published opinion of the Supreme Court reveals. However, further research in the briefs filed in *Silverstein* discloses that Judge PRICE's reading is correct: although litigation was persistently threatened, the dispute for which the attorneys' help was enlisted never went to court. Nonetheless, we cannot agree with Judge PRICE's application of the rule of *Silverstein* to the facts of this case.

*Silverstein* cannot correctly be cited as "a leading case on Rule 202's construction for in fact the Court did not rule on the question of the applicability of Rule 202 to non-court proceedings. The Court only held that Rule 202 did not operate to vitiate a contingent fee contract where that contract was admitted by both parties. Thus the Court did not find it necessary to discuss, and in fact did not discuss, whether the Rule applies to cases not falling under the Rules of Civil Procedure.

or against Weisman were pending in Allegheny and Beaver Counties.) The court refused, on the theory that it had no power to grant such immunity. Whether the court was right or not, appellants did not need a court order:

> The privilege of exemption from service of civil process enjoyed by a non-resident suitor *or witness* in a civil action has long been recognized by our courts to be an exception to the general rule that a creditor may subject his debtor to service in whatever jurisdiction he may find him: *Hayes v. Shields,* 2 Yeates 222; *Miles v. McCullough,* 1 Binn. 77.

> *Crusco v. Strunk Steel Co.,* 365 Pa. 326, 328, 74 A.2d 142, 143 (1950) (emphasis added).

-5-

Appellants argue that the lower court erred in certain rulings limiting defense evidence and cross-examination. Of these claims, four were not raised in post-verdict motions and have therefore been waived.[12] *Benson v. Penn Central Transportation Co.,* 463 Pa. 37, 342 A.2d 393 (1975).

The remaining four claims are without merit:

1 & 2. Appellants were cut short in their attempts to elicit testimony on why a deed from Gumbert to appellants had not been recorded, and on the details of a pending declaratory judgment action involving the property in question. However, this offered testimony was not relevant to any material issue. If appellants had shown that recordable title or a warranty of good title were elements of the contingency, the testimony would have been relevant; but

---

12. The four are: Peckich's testimony as to his expenditures prior to closing; (2) evidence of appellees' advice that Peckich's and Silverman's wives' signatures be omitted from certain documents at the closing; (3) cross-examination of Radakovich on his knowledge of the Code of Professional Responsibility in general, and its provisions on conflict of interest and excessive fees; (4) cross-examination of Frank on his allegedly hostile and provocative behavior amid preliminary negotiations with the Levinson Steel Company.

as we have already noted, appellants did not even attempt so to prove. Therefore the lower court's rulings on the testimony were proper.[13]

3. Appellants argue that they were improperly barred from cross-examining appellees on their connection with two businessmen who filed writs of foreign attachment against appellants' share of the Byers property after the April 25 closing. According to appellants, this line of questioning was intended "to bolster their argument that the requisite condition precedent had not occurred and the reason for such circumstance . . . ." Appellants' Brief at 57. For the same reasons as outlined above, the testimony appellants sought to elicit was not relevant to a material issue, and was properly barred.[14]

4. Appellants claim that they were not allowed to cross examine Frank on the circumstances of the termination of his employment at a Pittsburgh brokerage firm. The record is to the contrary: cross-examination on this point was allowed.

-6-

Finally, appellants assert that the lower court erred in dismissing their counterclaim. In fact, the counterclaim was not dismissed, but severed. Accepting this, appellants further argue that the severance was not warranted under Pa.R.Civ.P. 213(b), in that it was not "in furtherance of convenience or to avoid prejudice." However, as appellants did not raise this point in post-verdict motions, it has been waived. *Benson v. Penn Central Transportation Co.,*

13. *See* James, *Relevancy, Probability and the Law,* 29 Calif.L.Rev. 689, 691 (1941): "[E]vidence may be excluded as 'irrelevant' for either of these two quite distinct reasons: because it is not probative of the proposition at which it is directed, or because that proposition is not provable in the case."

14. Appellants do not argue that this line of questioning was intended to impeach Frank's credibility by showing bias or conflict of interest.

590

supra. Nothing in our disposition of this case precludes appellants from pursuing their counterclaim.

Judgment affirmed.[15]

HOFFMAN and CERCONE, JJ., join in this opinion.

PRICE, Judge, in support of reversal:

Differing on several issues with our colleagues who urge affirmance, we would vacate the judgment entered below and instruct the court to enter judgment n. o. v.

Appellants requested an instruction to the jury on Pa.R. C.P. No. 202, which the court denied. Our colleagues find no error in that denial. We disagree.

Pa.R.C.P. No. 202 provides:

"Agreements between attorney and client relating to compensation wholly or partly on a contingent basis shall be in writing, executed in duplicate. One executed copy shall be delivered to the client at the time of the making of the agreement, and the other shall be preserved by the attorney for at least two years after final judgment or settlement of the case. Such agreements shall be subject to inspection by the Court, by the appropriate committee

15. This appeal came before this court with an extensive brief by an *amicus curiae,* who argues in considerable detail that appellees were guilty of a variety of improprieties, both under the Code of Professional Responsibility and under the common law of public policy relating to attorneys' fees.

While we share the concern that members of the bar should conduct themselves ethically, we must in this case observe the rule that

[a]n amicus curiae is not a party and cannot assume the functions of a party . . . .. He has no control over the litigation and no right to institute any proceedings therein; *he must accept the case before the court with the issues made by the parties.*

4 Am.Jur.2d *Amicus Curiae* § 3 at 111 (1962) (collecting numerous cases) (emphasis added).

Here, three issues discussed by the *amicus* were never raised below by appellants. A fourth was pleaded, and some testimony on it adduced, but appellants have abandoned it on appeal.

The one issue discussed by the *amicus* that is properly before us is the applicability of Pa.R.Civ.P. 202. The *amicus*'s arguments on this issue do not persuade us that our disposition, *supra* at 636–637, is mistaken.

of the Bar Association of the County or of the Court, and by the Disciplinary Board of the Supreme Court of Pennsylvania."

Judge Spaeth declares that the rule "has no applicability to business conducted by attorneys and their clients in the world outside the courts . . . . Here, the contingent fee agreement between appellants and appellees was not related to a court case, but only to private contract negotiations." (Opn. in support of affirmance at 636). Judge Spaeth subsequently cites *Silverstein v. Hornick*, 376 Pa. 536, 103 A.2d 734 (1954), in support of a second proposition. *Silverstein*, a leading case on Rule 202's construction, is similar to the instant case in that the agreement there was likewise not made in anticipation of litigation. Rather, the clients elicited help of counsel "to ascertain their positions and rights in [an] estate, as well as in trusts which . . . had [been] established." 376 Pa. at 538, 103 A.2d at 736. An oral contingent fee agreement was made, and the clients' problem was ultimately resolved through negotiation and settlement. The supreme court found Pa.R.C.P. No. 202 applicable in *Silverstein*, and we find it equally applicable in the instant case.

As Justice Manderino observed in his concurring and dissenting opinion in *In re Berlant*, 458 Pa. 439, 328 A.2d 471 (1974):

"Contingent fee agreements have long been the subject of concern to the courts. They have been subjected to careful scrutiny to see that no unfair advantage is taken of the clients' position or lack of knowledge. [Citation omitted]. The object of such court scrutiny is to prevent injury to the client, to proscribe a relationship subject to abuse by the attorney. The cases considering the validity of contingent fee agreements make no distinction as to subject matter of the litigation taken pursuant to the agreement. Rule 202 of the Pennsylvania Rules of Civil Procedure, in requiring contingent fee agreements to be in writing, applies to *all* contingent fee agreements regardless of the kind of claim or case." 458 Pa. at 454, 328 A.2d at 480 (emphasis in original).

We believe the goals of Rule 202 should be vigorously promoted.

In *Silverstein,* the attorney, Orlow, agreed with his clients, husband and wife, that he would retain as his fee 15% of all funds recovered for them. The court observed:

> "Orlow . . . sent a letter to the New York attorney [who had referred the clients], stating, inter alia: 'I agreed with them . . . that we were to share in the extent of 15% for any amount recovered made in their behalf at any time hereafter.' Copies of this letter were also sent to each of the plaintiffs." 376 Pa. at 538, 103 A.2d at 736.

Orlow recovered a lump sum and after deducting 15% sent the remainder to his clients. The issue which the supreme court faced was not whether the oral contingent fee agreement existed, as in the instant case, but whether the admitted agreement applied to sums later received on the installment basis. The attorney contended, of course, that the agreement applied, a position which the clients contested.

Citing Rule 202, the clients suggested that because the matter was not "crystal clear" by the admitted terms of the agreement, the agreement should be construed against Orlow. The court rejected this proposal, finding instead that the agreement was intended to cover all sums received through the attorney's efforts. The court then declared that Rule 202's requirements

> "are procedural only, and are not intended to vitiate any contract between attorney and client. Compliance therewith is highly desirable, giving the Court greater aid and assurance in determining rights of the parties in the event of dispute, particularly as to reasonableness of the fee. However, *where the existence of a contract for such a fee is established, and the testimony establishes that it is reasonable, it will be upheld, even though verbal.*" 376 Pa. at 541, 103 A.2d at 737 (emphasis added).

In the instant case, the existence of the contract is certainly not "established". Where, as here, clients categorically deny the existence of a contingent fee agreement, were we to

accept the attorney's conflicting testimony as sufficient to establish the contract, we would clearly be doing nothing to further Rule 202's purposes.

The situation addressed by Pa.R.C.P. No. 202 and *Silverstein* is similar to the one involving the Pennsylvania Statute of Frauds and *Zlotziver v. Zlotziver*, 355 Pa. 299, 49 A.2d 779 (1946). That case stressed that a defendant who admits that a land sale contract exists cannot benefit from noncompliance with the statute mandating that such contract be in writing. Similarly, a principal who admits that a power of attorney to sell land exists may not benefit from his failure to comply with the statutory requirement of a writing evidencing such fact. *Lehner v. Montgomery*, 180 Pa.Super. 493, 119 A.2d 626 (1956).

In our judgment, when an attorney wishes the courts to enforce an oral contingent fee agreement, he is on shaky ground at best. However, in a case such as this one, where the attorney's word is pitted against his client's as to the existence of an agreement, the attorney simply should not be permitted to recover under the alleged contract.[1]

We also disagree with the conclusion reached by those who support affirmance that the alleged contingency was adequately established so that appellants were not entitled to judgment n. o. v.

> "Judgment n. o. v. should be entered only when the facts are such that no two reasonable persons could fail to agree that the verdict was improper." *Cummings v. Nazareth Borough*, 427 Pa. 14, 25–26, 233 A.2d 874, 881 (1967).

It is true that when deciding whether a motion for judgment n. o. v. should have been granted, we are required to examine the record in the light most favorable to the appellee. *Bohner v. Eastern Express, Inc.*, 405 Pa. 463, 175 A.2d 864 (1961). Viewing the evidence in that light, we feel

1. If footnote 11a of the opinion in support of affirmance is correct, and we strongly believe it is not, then there is very little vitality or usefulness in Rule 202. Common sense dictates that that interpretation is not correct. The excellent brief of amicus curiae on this point is most instructive and helpful.

that judgment n. o. v. for appellants should have been entered in the instant case.

Appellees' fifth amended complaint, upon which the case was ultimately tried, provides:

"12. On April 11, 1974, *when it became apparent that successful and desirable consummation of the various transactions was inevitable*, plaintiff Alan Frank quoted a fee of $200,000.00 for all services, payable on completion." (Emphasis added).

Assuming for the sake of argument that the proposed fee was accepted either expressly or tacitly by Peckich, appellees had the burden of proving the occurrence of the contingency alleged in their complaint. The issue then becomes, what is "completion" in the context of the Byers transaction, that being the point at which appellees are entitled to their fee.

Appellees' own testimony establishes that while there was a closing, there was not, as to Peckich and Silverman, "successful and desirable consummation of the various transactions." On cross-examination Attorney Frank testified that as a result of the April 25 closing, appellants received legal title to 80% of the land to which they were entitled under the assignment of the sales agreement to Weisman. Furthermore, although Weisman was to tender $2,000,000 at the closing, he was short $200,000. Frank agreed on cross-examination that Peckich and Silverman did not receive at the closing that for which they had bargained. When asked if the pair ever received the balance under the agreement, Frank admitted that he did not know.

Judge Spaeth writes for those who support affirmance, "Given the rather shaky case presented by appellees, one might suppose that appellants should have had little trouble in overcoming it. The interesting point is, however, that appellants in fact offered no evidence to prove the version of the contingency that they now argue." (Opn. in support of affirmance at 632). We heartily disagree. First, those who favor affirmance appear to be putting the burden on appellants to prove a negative, while acknowledging that appellees, who properly had the burden of proving the occurrence

of the contingency, established a "shaky" case at best. Second, the testimony of both Silverman and Peckich, as well as several other defense witnesses, was that the transaction was still unsettled at the time of trial; Weisman still had not completely performed as he was to do at the closing.[2]

2. Our colleagues contend that we err in our determination that they, in effect, place the burden on appellant to prove the non-occurrence of a contingency that appellee never adequately established. We adhere to our position. The complaint itself, which those who vote to affirm are ignoring, states that: "When it became apparent that successful and desirable completion of the various transactions was inevitable, plaintiff Alan Frank quoted a fee of $200,000.00 for all services, payable on completion." The clear implication of this is that in filing suit appellees hoped to recover a fee for their services performed in bringing about the "desirable completion of the various transactions." We maintain that appellees' own testimony establishes that that never occurred. The complaint does not specify the contingency as "payable at the closing," or "payable on substantial completion of the transaction," in which case appellees would undoubtedly be entitled to the fee (ignoring for the moment the fact that the agreement is contested and not in writing). Rather, by specifying "various transactions," the complaint indicates that Mr. Frank and Mr. Radakovich committed themselves to seeing through all facets of the Byers transaction.

In paragraph 10 of the complaint, appellees enumerated the services for which they sought a fee:

"10. The plaintiffs subsequently performed various such services at the request of defendant Peckich from time to time, which included the rendering of legal, financial, business and engineering advice, conducting legal and financial research, spearheading and conducting negotiations, attending meetings, conducting investigations, dictating or otherwise preparing the terms and details of legal documents, locating the best purchaser for scrap copper and scrap steel, locating the best purchaser for a portion of the entire composite of real estate and personalty acquired from the A. M. Byers Company and in general *performing, as requested, all things necessary to obtain for their clients the best terms and conditions in the various transactions involving the project.*" (Emphasis added).

Reading paragraphs 10 and 12 together, as we must, "completion" of the "various transactions" certainly indicates that the "best terms and conditions of the various transactions involving the project" would necessarily be brought to fruition. This, by appellees' own testimony, failed to occur. Therefore, we totally disagree with the conclusion that: "[A]ppellees having met their burden of going forward with proof of the terms of the contingent fee agreement and of the occurrence of the contingency, the burden shifted to appellants to disprove appellees' case." (Opn. in support of affirmance, 257 Pa.Super. at 632, n. 7a).

The fact that there was substantial satisfaction of the terms of the Peckich-Silverman/Weisman assignment does not entitle appellees to recovery because the contingency specified was "completion." The fact that appellants and Silverman made some gains from those phases of the Byers transaction that had been completed is also not determinative of appellees' right of recovery. Since the quantum meruit claim was dropped, the only possible recovery is from the contingent fee contract. Appellees' complaint avers that the fee was payable "on completion," which fact was announced to Peckich and Silverman "when it became apparent that successful and desirable consummation of the various transactions was inevitable." The only sensible interpretation of this paragraph of the complaint is that the fee was to be payable only when the successful and desirable consummation of the various transactions occurred. Since that did not happen prior to the time of trial, we would order entry of judgment n. o. v.

Finally, we feel compelled to comment that in our judgment this record reflects numerous blatant violations of both the letter and spirit of the Pennsylvania Code of Professional Responsibility. We find appellees' dealings with their clients to have been reprehensible. Even more pathetic, however, was appellees' total lack of knowledge concerning the Code, which presents the wise attorney with a useful framework within which to gauge his relationship with and performance for his client. At this point, it would certainly be appropriate, in our opinion, for disciplinary procedures to be pursued.

JACOBS, President Judge, and VAN der VOORT, J., join in this opinion in support of reversal.